# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:09CR393 |
| Plaintiff, ) | |
| ) | |
| vs. ) | FINDINGS AND |
| ) | RECOMMENDATION |
| TERESO NUNGARAY VIDALES, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the motion to suppress/dismiss (Filing No. 19) filed by defendant Tereso Nungaray Vidales (Vidales). Vidales is charged with possession of a stolen firearm, a Colt .38 caliber special revolver, in violation of 18 U.S.C. § 922(j). **See** Filing No. 1 - Indictment. Vidales challenges the warrantless search of his residence, arguing he denied consent to search yet officers unconstitutionally sought and coerced his girlfriend's consent. **See** Filing No. 19. Vidales seeks suppression of all evidence, including ammunition and the firearm, stemming from the residence's search. Vidales filed a brief (Filing No. 19-1), with four attached exhibits, in support of the motion. The government filed a brief (Filing No. 22) in opposition to the motion.

On November 9, 2010, the court held an evidentiary hearing on Vidales's motion. Vidales was present with his retained counsel, Jason M. Finch. Assistant United States Attorney Michael D. Wellman represented the United States. During the hearing, the court heard testimony from Omaha Police Department (OPD) Officers Matthew McKinney (Detective McKinney), Marlene Novotny (Sergeant Novotny), Robyn Ostermeyer (Detective Ostermeyer), and Mike Sundermeier (Detective Sundermeier), and Viridiana Nino (Nino). **See** Filing No. 24. The court received a permission to search form for a vehicle (Ex. 2) and a permission to search form for a residence (Ex. 3) into evidence. **See** Filing No. 25. A transcript (TR.) of the hearing was filed on November 17, 2010, whereupon the matter was deemed submitted.  **See** Filing No. 29.

**FINDINGS OF FACT**

Sergeant Novotny and Detective McKinney are graduates of the Omaha Police Training Academy and the Grand Island Training Academy, and hold certificates to act as peace officers in the state of Nebraska (TR. 4-5, 19).  Detectives Ostermeyer and Sundermeier are graduates of the Omaha Police Training Academy and hold certificates to act as a peace officers in the state of Nebraska (TR. 40-41, 65).  Sergeant Novotny has been with OPD for eight years, prior to which she was a law enforcement officer with the Douglas County Sheriff's Office for eleven years (TR. 18-19).  Prior to his employment with the OPD, Detective McKinney was a law enforcement officer with the Papillion Police Department (TR. 4-5).  Detective Ostermeyer has been with OPD for over five years (TR. 40).  Detective Sundermeier has been with OPD for six years (TR. 65).  In July 2009, Sergeant Novotny was with the regional squad that responded to all active felonies and Detectives McKinney, Sundermeier, and Ostermeyer were assigned to the Investigative Bureau conducting general investigations for OPD (TR. 5, 19-20, 41, 65).

On July 26, 2009, at approximately 9:15 p.m., Sergeant Novotny received a report of a walk-in shooting victim at Bergan Mercy Hospital (TR. 20).  Sergeant Novotny, with Detective Ostermeyer, arrived at approximately 9:30 p.m. (TR. 20, 41).  At the same time, Detective McKinney arrived at the hospital on Sergeant Novotny's request (TR. 5).  Detectives McKinney and Sundermeier arrived together (TR. 6-7, 66-67).

The detectives received information from Officer Neuman that security personnel observed a man, later identified as Vidales, drive up to the emergency room entrance, exit a vehicle, and enter the emergency room (TR. 7, 21).  The security personnel reported a female, later identified as Nino, exit the passenger side of the vehicle, enter the driver's side, and move the vehicle (TR. 7, 21).  Nino left the hospital on foot, then returned a short while later in a vehicle with other family members (TR. 53-54, 62).  At that time, Nino was detained by officers (TR. 21).  Officers who had arrived earlier talked to Vidales (TR. 22-23).  Vidales gave a statement that he had been walking in the area of 16th and Vinton Streets when he was shot by the occupant of a passing vehicle (TR. 23).  After this briefing, the detectives separated to further investigate the incident.

Sergeant Novotny spoke with an attending emergency room doctor who explained Vidales's injury was caused by a shot that entered the right front pelvic area and exited the

lower buttocks area, traveling from up to down and front to back (TR. 23-24). Additionally, the doctor noted stippling surrounding the injury (TR. 24). Sergeant Novotny testified stippling is burn marks left from the powder of a gun when it is fired at close range (TR. 24). Close range would be within two or three feet (TR. 24). The doctor advised Sergeant Novotny that the doctor thought the gunshot was self-inflicted based on the trajectory and stippling (TR. 25).

Detective Ostermeyer spoke with Nino who was seated in a patrol car (TR. 42). Detective Ostermeyer and Nino moved into the hospital's visiting area (TR. 42). Nino told Detective Ostermeyer that Nino had received a call from her boyfriend who said he had been shot and was driving himself to the hospital (TR. 43). Nino stated that when she arrived she found Vidales's vehicle parked in a handicapped stall, still running, so she moved the vehicle then went into the hospital (TR. 43). Detective Ostermeyer asked to see Nino's phone to verify the time of the call, but Nino stated the call came in from a private number and had been deleted from her phone's records (TR. 43). Nino explained she and Vidales had been together for about two years and had one child together and were expecting another child (TR. 44). Nino also stated she had a six year old from a prior relationship (TR. 44). Nino told Detective Ostermeyer that Nino lived with her mother on South 23rd Street and Vidales lived with his grandmother on North 16th Street (TR. 44). Nino relayed Vidales had been a member of a street gang until his arrest in March of 2009, from which time he no longer associated with the gang (TR. 44). Nino stated she did not believe Vidales carried weapons or had a weapon on July 26, 2009 (TR. 45).

After receiving the initial information, Detectives McKinney and Sundermeier approached a couple who had asked about Vidales (TR. 8). Detective McKinney heard from the female, Flores, who was a friend of Vidales, that she received a telephone call from Nino, who advised her that Nino and Vidales were, at the time of the call, on their way to the hospital because Vidales had been shot (TR. 8). Detective McKinney checked Flores' cellular telephone to confirm the call, which came in at 8:46 p.m. (TR. 8-9).

Detective Sundermeier spoke with Vidales's brother, Andres (TR. 67). Andres reported he came to the hospital in response to a call from Nino saying Vidales had been shot (TR. 67-68). Andres told Detective Sundermeier that Vidales lived in the same

apartment complex as Andres, near 86th and Lakeview Drive (TR. 68).  Additionally, Andres said that Vidales had been a gang member for quite a while (TR. 68).

After talking to Andres, Detective Sundermeier spoke to Vidales about his injury (TR. 12, 68).  At that time, Vidales was bleeding and in some pain, but alert and coherent (TR. 17, 69).  Doctors were attending Vidales throughout the time period (TR. 17).  Initially, Vidales told the officers he was shot while walking in the area of 16th and Vinton Streets by an unknown Hispanic male in a gray four-door Honda, then drove himself to the hospital (TR. 13, 69-70).  Detective Sundermeier asked Vidales if a swab of Vidales's hand might show gunshot residue (TR. 71).  Vidales said it probably would because he had fired a gun the previous day (TR. 71).  Vidales later said he had fired a gun that same day (TR. 71).  However, Vidales denied his gunshot wound was self-inflicted (TR. 71).

Sergeant Novotny informed the other detectives about the doctor's impressions (TR. 45).  Based on this information and Nino's earlier inconsistent statements, Detective McKinney joined Detective Ostermeyer to interview Nino for a second time (TR. 9-10, 45).  The detectives confronted Nino with the information they had gathered and Nino asked to move outside where she explained her earlier version of the events surrounding Vidales's injury was false (TR. 10, 45-46).  Nino admitted she shared an apartment with Vidales near 86th and Lakeview Drive (TR. 45-47, 56).  Nino told officers she was in her apartment when she heard a gunshot (TR. 10, 26, 45-47).  She ran to the livingroom to check on her one-year old daughter and saw Vidales with a gunshot wound to the abdomen (TR. 10-11, 47).  Nino told officers that during the drive to the hospital Vidales suggested Nino tell officers and hospital staff the false version, including how Vidales had been shot by an unknown passing vehicle in the area of 16th and Vinton Streets (TR. 10-11, 48).  Nino expressed concern for her and her child's safety if she told officers the truth about Vidales's injury (TR. 12, 47).  Nino told officers the firearm was still in the apartment (TR. 12, 26, 47).  Based on the information about the firearm, Detective Ostermeyer decided to ask Nino permission to search the apartment (TR. 57).  Nino agreed to accompany officers back to the apartment (TR. 12).

While at the hospital, Nino signed a form giving permission to search the apartment (TR. 26-28, 49; Ex. 3).  Nino did not fight or hesitate signing the form or appear to be under any duress (TR. 27-28, 49).  Nino spoke English well and did not appear to be under the

influence of any drug or alcohol (TR. 27-28, 49). Sergeant Novotny testified Nino was upset, but not crying (TR. 34-35). Nino appeared appropriately concerned about Vidales (TR. 53). Additionally, Nino was concerned about being seen as a "snitch" and cooperating with officers (TR. 53, 59). Nino stated she was afraid Vidales's brother, who was a gang member, might see Nino with the officers and be angry with Nino for allowing the officers to take the firearm (TR. 39). Based on information from Nino, the officers knew she was pregnant and Nino's one-year old was at the hospital with family members (TR. 34-35, 57-58). Detective Ostermeyer did not threaten to arrest Nino or send Nino's children to DHHS (TR. 37, 57). Sergeant Novotny and Detective Ostermeyer knew that Vidales had signed a consent to search the vehicle, but they did not have a copy of that form, nor had they seen Vidales's signed consent form prior to speaking with Nino (TR. 28-29). Sergeant Novotny was not told by any other officer that Vidales had denied consent to search the apartment (TR. 31). In fact, Sergeant Novotny was told that Vidales was not asked for consent to search the apartment (TR. 32).

At the same time Detectives McKinney and Ostermeyer went to talk to Nino, Detective Sundermeier went to talk to Vidales again (TR. 71-72). When confronted with other evidence, Vidales admitted he had shot himself at "his girlfriend's" apartment near 86th and Lakeview Drive (TR. 12-13, 72, 78). Vidales told the officers he placed the firearm into a brown paper sack, dropped it at the corner of 90th and L Streets, then called a friend to pick up the firearm (TR. 14, 72-73). Vidales stated he might be able to have that person bring the firearm to the hospital (TR. 77).

Vidales signed a form giving permission to search his vehicle (TR. 14-15, 73; Ex. 2). Detective McKinney was present when Vidales signed the permission to search form (TR. 75). Detective Sundermeier filled in the form including Detective Ostermeyer's name as an officer who would participate in the search (TR. 63, 73; Ex. 2). Detective Ostermeyer was not present when Vidales was asked about permission to search, nor was she involved in filling in the form (TR. 63, 74). After hearing the firearm might be at the residence, Detective Ostermeyer proceeded to the residence without searching the vehicle (TR. 63). Detective Sundermeier also initially wrote the address of the hospital on the form as the location to search, but then drew a line through the address (TR. 77; Ex. 2). Detective Sundermeier kept the signed three-copy form of the permission to search and did not show it to Nino (TR.

79). While searching the vehicle, officers found blood on the driver's seat, but no weapons (TR. 15). Detective Sundermeier did not ask, or hear another officer ask, Vidales for permission to search the residence (TR. 75-76, 80). Detective Sundermeier testifid he did not ask for consent to search the residence because Vidales stated he lived on North 16th Street (TR. 78, 80). Neither Detective McKinney nor Detective Ostermeyer asked, or heard any other officer ask, Vidales for permission to search the apartment near 86th and Lakeview Drive (TR. 15-16, 52). After speaking with Detective Sundermeier, Vidales was taken into surgery (TR. 81-82).

After searching the vehicle, Detectives McKinney and Sundermeier went to the area of 90th and L Streets (TR. 16). They did not find any evidence of a firearm or a paper sack (TR. 16). Detectives McKinney and Sundermeier proceeded to the apartment near 86th and Lakeview Drive (TR. 16).

At approximately 10:30 p.m., Sergeant Novotny drove Nino to the apartment near 86th and Lakeview Drive (TR. 25-26, 49). The officers found a Colt .38 Special caliber revolver and a shell casing on a mattress in the living room of the apartment (TR. 29, 50-51). Additionally, the officers found two boxes of live ammunition, one with .380-caliber rounds and the other with .38-special rounds (TR. 30, 50-51). The officers located other items associated with Vidales, weapons, and gangs (TR. 30, 50-51). Subsequent to the search, Sergeant Novotny drove Nino back to the hospital (TR. 52).

Nino testified at the hearing. Nino confirmed that on July 26, 2009, she and Vidales lived together in an apartment on 86th and Lakeview Drive (TR. 83). Nino testified she went to the hospital on the evening of July 26, 2009, because Vidales shot himself (TR. 83). Nino admitted she was not honest with officers initially, but stated she told the truth after Vidales "confessed" (TR. 83). Nino testified that a male officer placed her in a squad car for questioning and told her that if she did not cooperate the officers would take her kids away (TR. 84). Later, Nino testified the first threat occurred inside the hospital near a vending machine prior to her first interview with a female detective (TR. 93). Nino testified the same officer also told her that outside the hospital (TR. 84). Nino testified these same officers told her that they would go into the apartment with or without her consent (TR. 84-85). Nino testified these statements were made prior to her telling officers the firearm was in the apartment (TR. 85). Nino testified she felt threatened by the officer because he was

6

"invading her territory" and should not have involved the kids (TR. 85). At that time, according to Nino, the officer presented Nino with a permission to search form for the apartment (TR. 87). Nino testified she felt she could be arrested or have her children removed from her custody if she did not sign the form (TR. 89). Up to this time, no officer suggested Vidales had given his consent to search the apartment or the vehicle (TR. 87, 89). Nino did not tell either of the female officers about the threats made by the male officer (TR. 94). Nino admitted she did not want Vidales's family to think she was a snitch (TR. 95). Nino testified she accompanied the officers to the apartment and let them in because she felt she had to do so (TR. 90). Nino admitted she did not withdraw her permission to search (TR. 90). After the search the officers again told Nino she could get into trouble for lying about what had happened to Vidales (TR. 90).

## LEGAL ANALYSIS

Vidales argues Nino's permission to search was involuntarily given based on threats and coercion (TR. 99). Vidales contends the officers should have asked his permission, or at least given him a chance to object to the request to search (TR. 9-100). The government argues Nino's testimony is incredible based on the timing of the alleged threats in relation to when she gave permission to search (TR. 101).

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *U.S. Const. amend. IV*; **see** *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir. 2003) (Fourth Amendment applies to the states through the Fourteenth Amendment.). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005). The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **See** *United States v. Comstock*, 531 F.3d 667,

7

676-77 (8th Cir. 2008) (listing factors).  A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred.  *Id.* (**citing** *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)).

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (footnotes omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008).  The government bears the burden of proving voluntary consent to search by a preponderance of evidence. *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007).

In the present case, Nino testified she was threatened and intimidated into giving consent to search the apartment.  However, there is no evidence the officers told her Vidales had already consented to the search or, conversely, had denied consent to search. To some extent a credibility determination is necessary for determination of the legal issues in this matter.  The court finds the detectives more credible than Nino.  This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness and consistency with other testimony. Based on this credibility determination, the court discredits Nino's testimony with regard to any detective having threatened to remove her children from her if she did not sign the permission to search form.

Absent a threat to remove her children, Nino voluntarily consented to the search verbally, in writing, and by her actions.  At all times, Nino appeared to understand what was going on, followed directions and otherwise responded appropriately to the detectives.  The record clearly indicates Nino was concerned about the safety of her and her children to the

extent others may think she was a snitch. However, the remaining facts of the case do not establish consent was involuntary. Nino was not under arrest and was freely moving around the hospital between interviews. The consent form advises the signor about the right to refuse. Nino did not mention her concern about the threats to the female officers with whom she spoke at length. Additionally, Nino did not mention the concern when she rode alone with the female officers. By contrast, Nino did mention other concerns to the detectives. Furthermore, several minutes elapsed between the alleged threat at the vending machine and Nino's interview by a different detective. Finally, the permission to search form was not presented by the same detective as the detective who allegedly made the threats. Under these circumstances the court discredits Nino's testimony and finds Nino voluntarily gave consent for the officers to search the apartment. Accordingly,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Tereso Nungaray Vidales's Motion to Suppress/Dismiss (Filing No. 19) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 27th day of December, 2010.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.